IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:05-cv-497-F

CURTIS W. BAKER, DMD,

            Plaintiff,

            vs.

UNUM LIFE INSURANCE COMPANY OF AMERICA,

et al.,

            Defendants.


        S T I P U L A T I O N

        IT IS STIPULATED AND AGREED by
and between the parties through their
respective counsel, that the deposition of
Curtis W. Baker, D.M.D., may be taken
before Anita Thebo, Commissioner, at the
offices of Joel S. Rogers, at 1622 7th
Street North, Suite 130, Clanton, Alabama
35045, on the 5th day of October, 2005.

    DEPOSITION OF CURTIS W. BAKER, D.M.D.

                        (43063)

DEFENDANT'S
EXHIBIT

1

Page 9

1        A.     Okay.

2        Q.     Will you state your full name.

3        A.     I'm sorry, say that again.

4        Q.     Your full name.

5        A.     Curtis Wylie Baker.

6        Q.     W-I-L-E-Y?

7        A.     W-Y-L-I-E.

8        Q.     Very good.

9        Your date of birth is February 5,

10   1938?

11       A.     That's correct.

12       Q.     You turned sixty years old in

13   1998, correct?

14       A.     I'm sorry?

15       Q.     You turned sixty years old in

16   1998?

17       A.     I think that's about right, if

18   I do my math.

19       Q.     You're currently sixty-seven?

20       A.     I'm sixty-seven now.

21       Q.     Social security, 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?

22       A.     That's correct.

23       Q.     Do you have an Alabama

1    Q.    You said he took over your

2    practice?

3    A.    Yes.  He was already in

4    practice with me when I got sick.  He had

5    been with me about ten or eleven years

6    then, so the patients knew him well, and

7    so he just carried on with it.

8    Q.    Do you still own any portion

9    of the practice?

10    A.    No.

11    Q.    You sold out to him?

12    A.    Yes.

13    Q.    Was there an actual written

14    agreement where you sold out to him?

15    A.    A written agreement?

16    Q.    Yes, sir.

17    A.    When I sold to him there

18    was --

19    Q.    There was a written agreement?

20    A.    Well, a deed to the property.

21    Q.    Okay.  Did you sell --

22    A.    I didn't sell the practice as

23    such, I sold the real estate to him.

1       Q.      I've got you.

2       A.      -- which is also truthfully.

3       Q.      That's fair.  Have you been on

4  any vacations or trips since January 2003?

5       A.      We have visited her relatives

6  some in Louisiana.

7       Q.      Okay.

8       A.      And we visited some friends in

9  Georgia.  But she was always driving, so

10  all I had to do was sit there.

11       Q.      Do you have photographs of

12  those trips?

13       A.      No.  We don't take many

14  pictures.

15       Q.      I don't either.  My wife does.

16  She can run through some photographs.

17       A.      I don't think we have any --

18  If she has any pictures of those, I don't

19  remember ever having seen them.

20       Q.      You're a doctor of dental

21  medicine?

22       A.      I'm sorry?

23       Q.      You are a doctor of dental

Page 28

1    medicine?

2        A.    Correct.

3        Q.    Where did you go to high

4    school?

5        A.    Right here, Chilton County

6    High School.

7        Q.    Do you recall what year you

8    graduated high school?

9        A.    I'm sorry?

10        Q.    What year graduated?

11        A.    1955.

12        Q.    Where did you go to college?

13    College?

14        A.    Birmingham Southern.

15        Q.    Four years?

16        A.    Yes.

17        Q.    You went to medical school

18    after that?

19        A.    I went to dental school after

20    that.

21        Q.    Four years of college and then

22    dental school?

23        A.    Four years of dental school.

1    Q.    Where did you go to dental

2  school?

3    A.    University of Alabama in

4  Birmingham.

5    But at the time I went it was not

6  UAB, it was just University of Alabama

7  School of Dentistry.

8    Q.    All right.  What year did you

9  graduate from University of Alabama School

10  of Dentistry?

11    A.    1963.

12    Q.    Is there a residency or

13  internship after that?

14    A.    No.

15    Q.    You went right into practice?

16    A.    I went right into practice.

17    Q.    Where did you first work?

18    A.    Right here in Clanton.

19    Q.    You set up your own shop?

20    A.    No.  I went in with an older

21  dentist for about -- I think about three

22  months, the best that I remember.  Because

23  I had applied for -- What's the word?

1    advance for:  Have you ever had an

2    addiction to drugs or alcohol?

3         A.    No.

4         Q.    Have you ever been treated for

5    any drug or alcohol problem?

6         A.    No.

7         Q.    When did you sell your

8    practice real estate to your son, how long

9    ago?

10        A.    I'm sorry, ask me that again.

11        Q.    How long ago did you sell your

12   practice to Christopher?

13        A.    I guess it was about a year

14   ago.

15        Q.    You were the sole, one hundred

16   percent owner up until then, right?

17        A.    Yes.  Yes, I was.

18        That's all a matter of public record

19   in the courthouse, but I don't depend upon

20   my mind too much.

21        Q.    You mentioned the possibility

22   of being called into the service, have you

23   ever served in the military?

1    is my signature (indicating), but that's

2    just her printed name right there.

3         Q.    Did she write that or did you?

4    It says name of person completing form,

5    Beverly R. Baker.

6         A.    That's her writing on her

7    name, but that's my signature.

8         Q.    So she, Beverly, certainly

9    assisted you in your correspondence and

10   communication with Unum Life?

11        A.    She's been my private

12   secretary.  And I honestly -- When she was

13   -- I never read this stuff, she just said

14   sign here, and I signed it.

15        Q.    You certainly authorized her

16   to fill this stuff out for you?

17        A.    Okay.

18        Q.    Correct?

19        A.    I'm sorry?

20        Q.    You authorized her to fill

21   these forms out?

22        A.    Yes.  I was not able to do it.

23        If she hadn't done it, it wouldn't

1       Q.   Aside from your gall bladder

2   surgery, have you been hospitalized since

3   January 4, '03?

4       A.   No.

5       Q.   The third page of this exhibit

6   is a claimant's statement.  It lists your

7   sickness as bacterial meningitis dated

8   December 19, 2002, right?

9       A.   Yes.

10      Q.   It says that you've been

11  unable to work since that date, right?

12      A.   Yes.

13      December 18 was my last day in the

14  office.

15      Q.   It states that your bacterial

16  meningitis caused deafness, vertigo,

17  nausea, and headaches, correct?

18      A.   Yes, it did.

19      Q.   Tell me about the onset of the

20  meningitis.

21      A.   Tell you about what?

22      Q.   How did it -- How did you

23  first begin to experience the symptoms of

Page 56

1    Q.    You were disabled as a result

2    of the meningitis, correct?

3    A.    When we got to the hospital,

4    Dr. Brackin had some doctors there, I

5    don't know who.  But they determined that

6    it was meningitis up there.  Until they --

7    They thought I had had a stroke; when

8    Chris and my wife looked at me and I was

9    in that grand mal seizure, they thought I

10   had had a stroke.  But it was the

11   meningitis.

12   Q.    You were not disabled as a

13   result of an accident or an injury,

14   correct?

15   A.    I'm sorry?

16   Q.    You were not disabled as a

17   result of an accident or an injury?

18   A.    I haven't had an accident or

19   an injury.

20   I got injured a little bit -- I did

21   a little injuring when I was playing

22   football, but that was --

23   Q.    You certain weren't disabled

1  as a result of bodily harm caused by an

2  accident?

3      A.    I'm sorry, try that one more

4  time.

5      Q.    You certainly were not

6  disabled as a result of bodily harm caused

7  by an accident?

8      A.    No.  No.

9      Q.    Tell me about your condition

10  after you got out of the hospital.  You

11  said you got out in early January and then

12  had to go right back in for your gall

13  bladder?

14      A.    Yeah.

15      Q.    After you got out from your

16  gall bladder surgery, what was your

17  condition in January 2003?

18      A.    Up until the time of the gall

19  bladder surgery?

20      Q.    Yes, sir.  And then tell me

21  after.

22      A.    I had to walk with a walker; I

23  had a lot of problems with my equilibrium;

1   me to tell.

2       Q.    Have you gone back to your

3   practice at all since?

4       A.    I'm sorry?

5       Q.    Have you been back to your

6   office since December of 2002?

7       A.    I go by and pick up my mail.

8       Q.    You haven't seen any patients

9   since December of 2002, have you?

10      A.    Not -- No.  I have not been in

11   there as a practicing dentist since then.

12      Q.    You haven't done any work for

13   compensation there since December of 2002?

14      A.    No.

15      Q.    You haven't done any work

16   there as a practicing dentist, whether for

17   compensation or not, since 2002, correct?

18      A.    Right.

19      Q.    Have you worked anywhere, for

20   compensation or not, at any place since

21   December 2002?

22      A.    No.

23      Q.    And I covered this but let me

Page 68

1    equilibrium.

2         Q.    Have your problems --

3    Obviously your problems have gotten better

4    since December of 2002.  You're not in a

5    coma anymore.

6         A.    Wait a minute.  I'm sorry, say

7    that again.

8         Q.    Obviously your problems with

9    the meningitis have improved since

10   December of 2002?

11        A.    Oh, yes.  If they hadn't, I'd

12   be dead.

13                    (Whereupon, Exhibit No.

14                    5 was marked for

15                    identification.)

16        Q.    Right.  Let me ask you to --

17   Before I go to that, let me show you

18   Exhibit 5.  Is that an accurate list of

19   the employees of Curtis W. Baker, D.M.D.,

20   as of the time you stopped working?

21        A.    There's another one, there's

22   Linda Thomas that you don't have listed.

23        Q.    Any others that worked there

1    when you last worked there?

2        A.    Linda Thomas was my chairside

3    assistant for thirty-something years,

4    thirty-five years.

5        Q.    You also mentioned earlier --

6        A.    Vanessa is her daughter.

7        Q.    You also mentioned earlier

8    your administrative assistant?

9        A.    I'm sorry?

10       Q.    Your administrative assistant?

11       A.    Okay.  That was Melba.

12       Q.    And she's not on here.  Had

13   she stopped working --

14       A.    Kim is still there.

15       Q.    Melba is there, I'm sorry.

16       A.    Karen Porter, I don't remember

17   Karen Porter.

18       I don't believe she's still there.

19   I don't even remember Karen Porter.  But

20   Chris has had some in and out there.  I

21   sort of turned the hiring over to him

22   because I was hoping some day to turn the

23   entire practice over to him.

1    But we got along so well together,

2    till he told me one day, he said, Daddy,

3    we've just built two practices.  And we

4    just enjoyed working together so much.

5                         (Whereupon, Exhibit No.

6                         6 was marked for

7                         identification.)

8        Q.    Now, let's go to Exhibit 6,

9    please, sir.  This is an April 4, 2003,

10   note from Dr. Eslami.  He references a

11   cochlear implant in the right ear, and you

12   have that, correct?

13       A.    He didn't want me driving any

14   there for a long time.

15       Q.    You did receive a cochlear

16   implant, right, in the right ear?

17       A.    Cochlear implant,

18   (indicating).

19       Q.    Yes, sir.  And you have a

20   hearing aid in the left ear?

21       A.    Well, they told me here about

22   three months ago to quit using my hearing

23   aid, they thought it was interfering with

1        Q.    You found one with your

2  signature?

3        A.    I finally found one.  But she

4  has sort of --

5        Q.    But she had your authority to

6  act -- to correspond with Unum Life on

7  your behalf?

8        A.    Say that again.

9        Q.    She had your authority to

10  correspond with Unum Life on your behalf?

11        A.    Yes.  Yes, she did.

12        MR. FINK:  Let's take a

13  five-minute break.

14             (Recess was taken.)

15        Q.    Dr. Baker, did you and Beverly

16  truthfully and accurately relate your

17  condition and activities to Unum Life

18  throughout your claim?

19        A.    Yes.

20        Q.    Aside from social security and

21  the Great West policy, did you receive

22  benefits from any other source other than

23  these four Unum Life policies?

1      A.    Well, I have sold some

2   property that I'm just being paid for it,

3   that's all.

4      Q.    You haven't filed any claims

5   for anything other than social security,

6   the Great West policy, and the policies in

7   this lawsuit, have you?

8      A.    No.

9      Q.    And you're not aware that you

10   have any other disability insurance?

11      A.    No.  Not to my knowledge.

12      Q.    Have you ever had any other?

13      A.    Years ago, I did.  I don't

14   remember what it was.  I do remember that

15   it had a lifetime disability in it though,

16   and I honestly thought that's what this

17   was.  I didn't read things like I should

18   have.

19      Q.    You thought -- And I can tell

20   from your complaint in this case that you

21   thought that one of the four policies

22   mentioned in your complaint had a lifetime

23   benefit, correct?

1    A.    Yes, I did.

2    Q.    You don't still feel that, do

3    you?

4    A.    I haven't really read them

5    that closely.  I don't know what I've got.

6    Q.    Okay.  And we'll get into

7    that.  We'll take a closer look into the

8    four policies.

9    But you believe that at some point

10    in time you had other insurance that you

11    don't presently have that had a

12    lifetime --

13    A.    Well, when I took this

14    insurance out, I specifically told the

15    agent that I wanted disability insurance

16    that would cover me for life if I were

17    unable to practice dentistry.  And that's

18    what I thought I was getting.

19    Q.    And that was with -- That was

20    the conversation with Jim Large?

21    A.    Yes.

22    Now, in his defense, Jim tells me

23    that he told me that this was not for

Page 87

1  life.  I don't remember that, but I

2  believe he's an honest man.  I don't think

3  he would misrepresent it for me.

4      Q.   When did he tell you that,

5  just recently?

6      A.   It was years ago.  I don't

7  know.

8      Q.   But when did he tell you that

9  he told you that this was not for life?

10     A.   I don't remember.

11     Q.   It was after you made this

12 claim in this case?

13     A.   I think so.  I think it was

14 after I made -- Yes, it was after I made

15 the claim.

16     Q.   And did you call him or did he

17 call you?

18     A.   I'm sorry?

19     Q.   Did you call Jim?

20     A.   Well, I didn't.  Beverly may

21 have.

22     Q.   And during that conversation,

23 he told you or Beverly that he never told

Page 102

1    the YMCA, right?

2         A.    Yes.

3         Q.    Dr. Baker, do you contend as

4    you sit here today that your condition

5    prevents you from performing the duties of

6    a dentist?

7         A.    Yeah.  Well, I can't hear well

8    enough to communicate with my patients; I

9    might miss something that's extremely

10   important.

11        Q.    Are there other --

12        A.    And I can't physically hold

13   out to do it either.

14        Q.    What I'd like to do is just

15   list the conditions that prevent you from

16   performing the duties of a dentist.  And

17   this isn't a trick, you've listed some,

18   and we'll just go through those, and you

19   can tell me if there are any more.

20        A.    Okay.

21        Q.    You've listed your deafness?

22        A.    I'm sorry?

23        Q.    Deafness, difficulty hearing?

1    A.    Yeah.

2    Q.    You mentioned earlier vertigo,

3 are you still having problems with vertigo

4 or has that resolved?

5    A.    No, I still have trouble with

6 that.

7    Well, not true vertigo now.  Because

8 true vertigo is where you really lose it.

9 I just have some trouble with my balance,

10 but it doesn't go quite as far as vertigo.

11    Q.    Does that keep you from

12 performing as a dentist?

13    A.    I'm sorry?

14    Q.    Does that problem keep you

15 from performing as a dentist?

16    A.    Well, how would you feel if

17 your dentist staggered into the room to

18 work on you?

19    Q.    You mentioned short-term

20 memory loss.

21    A.    Yes.

22    Q.    Do you still experience that?

23    A.    Yes, I do.  But not as much as

1    I used to.  It's somewhat improved.  But I

2    still have a -- like Dr. Pappas, I have a

3    terrible time remembering that name.

4         Q.    We've talked about some

5    improvement with your hearing, and you've

6    also in fairness mentioned some concerns

7    about a future decrease in hearing.

8         But for now you're experiencing

9    greater hearing than you have previously?

10        A.    I don't know what the future

11   of my hearing is going to be right now.

12        Q.    But as it exists right now,

13   you feel that it prevents you from

14   performing the occupation of a dentist?

15        A.    Well, yes, I do.  Because you

16   have to be very observant when you're

17   working on somebody.  Some of the things

18   we do as a dentist can be life

19   threatening.  And if I ask the patient and

20   they said -- a question and they said

21   something and I misunderstood what they

22   said, it could be very detrimental to the

23   patient.

1    Q.    Other problems, you mentioned

2  that physically you have problems, aside

3  from what we've mentioned, you can't hold

4  up I believe is what you said.  Is that a

5  fatigue, how would you characterize that?

6    A.    Yes.  It sort of feels like

7  fatigue.  But it's -- It sort of is

8  related to stress too.  For example, when

9  I finish here today, I will be exhausted,

10  and we haven't done much.  But I'll

11  probably go home and relax for an hour or

12  so.  And I just am not able to work under

13  a lot of stress.  I used to just thrive

14  under stress, I don't anymore.

15    Q.    Do you relate that to the

16  meningitis?

17    A.    Well, I didn't have it before.

18    Q.    I saw in some of the medical

19  records that you had at one point some

20  problems with your left eye, do you recall

21  that, any vision problems?

22    A.    I don't --

23    Q.    To the extent you had any,

1    Q.    Can you hear anything out of

2    your left ear?

3    A.    Yes.  But I can't understand.

4    I can hear a noise with my left ear, but

5    if I'm talking to you, I couldn't

6    understand what you were saying with my

7    left ear.

8    Q.    Which of your ears was most

9    damaged by the meningitis?  Was it your

10    right ear?

11    A.    Well, I really thought it was

12    my left ear, but they decided to put the

13    implant in the right ear, so I guess the

14    right ear was damaged more than the left

15    ear.

16    But there was some confusion there

17    on my part because the infection came from

18    the left ear.  But I had such a terrible

19    infection from it, my brain swelled.

20    And I read an article about

21    meningitis a few weeks ago that said when

22    it gets to the point where your brain

23    swells, it is one hundred percent fatal.

1   But I'm still here.  Like the little

2   doctor said, maybe I had some extra help.

3        Q.    No question.

4        You've told me you can hear some

5   stuff with your left ear, but you can't

6   understand.  Do you hear high frequencies

7   better, lower frequencies --

8        A.    If you shot a gun, I'd hear

9   the bang.

10       Q.    You told me when we got

11  started here today that you have an easier

12  time hearing a woman's voice as opposed to

13  a man's voice.

14       A.    Generally speaking.  I've been

15  able to hear yours better than most any

16  man's voice.  I don't know what the

17  difference is.

18       Q.    I've been giving you my

19  high-pitched voice.

20       A.    Maybe you're enunciating

21  better than most men do.

22       Q.    In your right ear, are there

23  some things you hear better with your

1    implant than other things?  Can you kind

2    of just describe for me whether -- you

3    know, what things you hear better and what

4    things you don't hear so well?

5         A.    Now, I can hear, I can

6    understand you talking, if we're in a room

7    like this.

8         Now, if we were in a restaurant, I

9    couldn't understand a thing you were

10   saying with the clanging of the dishes and

11   all the noises.

12       When I get really tired, I don't

13   hear well at all, it just seems to go

14   away.  And I'm not able to understand -- I

15   just have to go get some rest when I get

16   really tired, because I'm at a total loss

17   then.

18       Q.    I don't have any training in

19   audiology, so this might seem like a

20   strange question.

21       A.    I don't either.

22       Q.    Have you had any tests

23   performed that tell you like what

1    percentage of hearing loss you have in

2    your left ear and what percentage of

3    hearing loss you have in your right ear?

4        A.    I think -- Yes.  I think Lynn

5    Carmichael did all those tests on me.

6        Q.    Do you recall what they said?

7        A.    I believe she said I had a

8    total loss in the right ear, and I don't

9    remember what she said about the left ear.

10       All I remember her saying was,

11   you've got a little bit of hearing left in

12   your left ear, but not much.

13       Q.    Did she tell you what

14   percentage of hearing loss you have with

15   the assistance devices?

16       A.    I don't remember her saying

17   that.

18       Q.    Okay.

19       With regard to your balance

20   problems, you said you're off medication

21   for that, right?

22       A.    Yes.

23       Q.    So that problem has improved

Page 120

1    any restrictions from your doctors?

2          You joked about Dr. Eslami and your

3    flying, and at one point I understand you

4    were restricted from driving?

5          A.    They restricted me for a long

6    time from doing any driving at all.  And

7    then they started permitting me to just

8    drive locally with somebody else in the

9    car with me.  But I guess about -- Well, I

10   can't remember how long it's been.  But I

11   told Dr. Eslami that I was driving some,

12   and he said, well, I think you'll be all

13   right, just be careful.

14         I don't have any problem.  My wife

15   says I've always been a terrible driver.

16         Q.    She hasn't noticed any change?

17         A.    She didn't notice any change

18   from the meningitis.

19         Q.    Are you presently able to

20   drive on your own more than just short,

21   local distances?

22         A.    Yeah.  I don't -- I have

23   driven to Gulf Shores one time; I have a

1  friend down there that I fish with some.

2  But most of my driving is just locally

3  here.  If we start to go to Birmingham or

4  Montgomery, my wife drives.

5       Q.    When did you drive to Gulf

6  Shores, how long ago?

7       A.    That was about the first of

8  the summer.  It hasn't been long.

9                        (Whereupon, Exhibit No.

10                       9 was marked for

11                       identification.)

12      Q.    Let's talk about your

13  complaint in this lawsuit.  Exhibit 9 is a

14  copy of your complaint:  Is that your

15  signature on the last page?

16      A.    No.  That's Joel's.

17      Q.    I'm sorry.  Let's try the next

18  to the last page.

19      A.    Yes, that's my signature.

20  That one too (indicating).

21      Q.    All right.  Let's take a look

22  at paragraph three if you will on the

23  first page.

Page 122

1      It says that you have three
2   different disability policies with
3   defendant corporation and a fictitious
4   party, and you list the three policy
5   numbers; and you say you have one business
6   overhead policy, and you list that policy
7   number; then you say that you have one or
8   more lifetime rider policies.  You see
9   that?
10          A.    I don't know about that.  I
11   see what you're talking about.
12          Q.    What I'm trying to figure out,
13   what these one or more lifetime rider
14   policies are.  Do you have any idea what
15   that refers to?
16          A.    I don't know what that is.
17                      (Whereupon, Exhibits No.
18                      10, 11, 12, and 13 were
19                      marked for
20                      identification.)
21          Q.    Let me show you the four
22   policies that are referenced there, and
23   I've marked them as exhibits.

Page 126

1    A.    -- I don't believe that's

2    still in effect.

3             MS. ROGERS:  He had some --

4    A.    I think when I took these

5    others out, I dropped this one

6    (indicating).

7    Q.    Well, that is one that's

8    referenced in your complaint, Doctor.

9    A.    I took that out with Ms. Alice

10   Hayes.

11            THE WITNESS:  Do you remember

12   her?

13   A.    I think I dropped that policy

14   several years ago.

15            MR. FINK:  Off the Record.

16                 (Off the Record.)

17            MR. FINK:  Back on the Record.

18   Q.    You mentioned that you believe

19   that you would have received copies of

20   these policies at or about the time that

21   they were issued, correct, Dr. Baker?

22   A.    I feel sure that, yes, that I

23   did.

1    Q.    Would it have been your

2  practice to read the policies when you

3  received them?

4    A.    I'm sorry?

5    Q.    Would it have been your

6  practice to read the policies when you

7  received them?

8    A.    No.

9    Q.    You were certainly capable of

10  reading the policies when you received

11  them, correct?

12    A.    I think probably I just had so

13  much confidence in Jim till when I got a

14  policy, I just filed it, you know.  I

15  think Beverly possibly read them

16  sometimes.  Or if there was something that

17  I had a question about, I'd go back and

18  look at it.

19    Q.    You were certainly capable of

20  reading them when you received them,

21  correct?

22    A.    Yes.

23    Q.    And if you had a question, you

1    Paragraph four of your complaint,

2  which is Exhibit 9.  You say you became

3  disabled on December 18, 2002, and your

4  disability benefit began to accrue on

5  policy numbers H 061154; on policy

6  LAD169668 that's Exhibit -- the first one

7  was Exhibit 10, the second one is Exhibit

8  11.

9    On policy LAN550174, which is

10  Exhibit 12, correct; and on policy

11  LAN550175, which is Exhibit 13, correct?

12    A.    Uh-huh (positive response).

13    Q.    You were sixty-four years old

14  in December of 2002, and you turned

15  sixty-five on February 5 of 2003, right?

16    A.    I think that's right.

17    Q.    That's not a trick question,

18  that's as good as my math could do.

19    Let's look at Exhibit 14.  That's a

20  letter dated February 25, 2003, to your

21  wife regarding you, correct?

22            (Whereupon, Exhibit No.

23            14 was marked for

1  right?

2      A.    That's right.

3      Q.    In the first paragraph --

4  excuse me, the second paragraph, it talks

5  about policy H 0601154, which is Exhibit

6  10.

7      A.    Yeah.

8      Q.    And it tells you -- It tells

9  you that it's got a maximum benefit period

10  to age sixty-five but not less than

11  twenty-four months.  Do you see that?

12      A.    I see that.

13      Q.    It also says that you began

14  receiving benefits of seven hundred

15  dollars a month under that policy, do you

16  see that?

17      A.    Uh-huh (positive response).

18      Q.    You don't deny that you had

19  begun receiving benefits under that policy

20  as of February of 2003, do you?

21      A.    Yes, I see that.

22      Q.    And you don't deny that you

23  did actually receive benefits under that

1    policy as of February 2003, do you?

2        A.    No, I don't deny it.  I don't

3    remember if it were that specific date or

4    not, but it probably was.

5        Q.    You don't deny that that

6    policy has a maximum benefit period to

7    either age sixty-five or a minimum of

8    twenty-four months, do you?

9        A.    That's what it sounds like.

10        Q.    You don't deny that that

11    policy had a maximum benefit period to age

12    sixty-five, but not less than twenty-four

13    months?

14        A.    That's exactly what it says

15    here.

16        Q.    And you don't have any reason

17    to disagree with that, do you?

18        A.    No.

19        Q.    And even if you did disagree

20    with it, Unum Life told Beverly that back

21    in February of 2003, right?

22        A.    Yeah.

23        Q.    Dr. Baker --

Page 136

1       THE WITNESS:  What am I

2   supposed to say there?

3       MS. ROGERS:  Tell him the

4   truth.  Just tell him what you know.  If

5   you don't know, you say you don't know.

6       THE WITNESS:  Okay.

7       Q.    You don't deny, Doctor, that

8   you received benefits for twenty-four

9   months under that policy, do you?

10      A.    I feel sure that I did.

11      Q.    Does that policy, Exhibit

12  10 --

13      A.    I don't think that one -- I

14  don't remember receiving anything from

15  this policy.  I don't believe this one was

16  still in effect.  I think that's an old

17  policy that I had dropped when I took out

18  these with Unum.

19      Q.    So you think that this letter

20  is wrong and that you weren't receiving

21  seven hundred dollars a month under that

22  policy?

23      A.    I don't remember --

1    Q.    And do you think your

2  complaint is wrong also where it

3  references that?

4    A.    I'm sorry?

5    Q.    Do you think that your

6  complaint is wrong where it references

7  that policy?  This is your -- Exhibit 9 is

8  your complaint, and it references policy

9  number -- the first one, H 0601154.  And

10  it also --

11    A.    It may have still been active,

12  but I thought that I had cancelled that

13  policy.

14    Q.    Well, let's proceed under the

15  assuming it was still accurate, because

16  your attorney felt it was and my client

17  certainly felt it was, and my client paid

18  you benefits under it, and I don't think

19  they would have done that if they didn't

20  think it was active.

21    A.    Okay.

22    Q.    So let's proceed with the

23  assumption it was an active policy.

1      A.    All right.

2      Q.    I don't have any information

3  to the contrary unless you do.

4      Do you contend that you're entitled

5  to any further -- Having admitted that you

6  don't deny that you got twenty-four months

7  benefits under that policy, you don't

8  contend that you're entitled to any more

9  under this policy, do you?

10      A.    No.

11      Q.    So you don't feel you're

12  entitled to further benefits under Exhibit

13  10, correct?

14      A.    Right.

15      Q.    Let's go back to Exhibit 14,

16  this letter.  Right here (indicating),

17  bottom paragraph, it says:  Under the

18  terms of policy CLA023990 there's a

19  ninety-day elimination period during which

20  no benefits are payable.

21      And it goes on to say that this

22  policy provides a monthly benefit of two

23  thousand eighty dollars and a maximum

1    benefit period to the later of sixty-five

2    or twenty-four months after disability

3    payments begin.  You see that?

4          Do you see that?

5          A.    Yes, I see that.

6          Q.    That policy is Exhibit 11,

7    LAD169168.  And there's actually a good

8    cross-reference of the claim numbers to

9    the policy numbers in your complaint,

10   which I believe is accurate.

11         You don't deny that Exhibit 11

12   provided for a maximum benefit period of

13   the later of your reaching sixty-five or

14   twenty-four months from the date of

15   disability, do you?

16         A.    Well, this says until age

17   seventy-five.

18         Q.    Okay.  And where exactly are

19   you reading from?

20         A.    (Witness indicates.)

21         Q.    You're reading:  Disability

22   income policy noncancellable to age

23   sixty-five at guaranteed premium rate

Page 140

1    thereafter until age seventy-five,

2    correct?

3        A.    Right.

4        Q.    Have you reviewed this policy

5    to determine the applicable language for

6    that age limitation?

7        A.    I'm sorry?

8        Q.    Are you telling me that you're

9    entitled, based on that language, to

10   receive further benefits under the policy

11   beyond the earlier of age sixty-five or a

12   maximum of twenty-four months from the

13   date of disability?

14       A.    Well, it looks like that's

15   what it says.

16       Q.    And you're basing that on the

17   language on the second page of that

18   exhibit, which is Bates labeled ULP0002,

19   correct?

20       A.    It looks like if I -- if it's

21   renewable up to age seventy-five I should

22   have benefits up until age seventy-five.

23       Q.    Go ahead and read the whole

1  section that you're referring to.

2      A.    (Witness complies.)

3      Q.    Go ahead and read it out loud

4  if you don't mind.

5          MS. ROGERS:  Let the Record

6  reflect that Dr. Baker did not hear the

7  question.  He was looking at the paper.

8      Q.    Let me read that whole

9  provision and ask you if I read it

10 correctly.

11     Disability income policy

12 noncancellable to age sixty-five at

13 guaranteed premium rate.  Thereafter until

14 age seventy-five, renewable on each policy

15 anniversary on which you are employed at

16 least thirty hours per week.  After age

17 sixty-five, premium rate is based on your

18 age on each renewal date.

19     Did I read the entire section

20 correctly?

21     A.    (Witness nods head in the

22 affirmative.)

23     Q.    You were never employed at

1    least thirty hours per week after age

2    sixty-five, were you?

3        A.    No.   That seems like sort of a

4    confusing statement there.   If it's a

5    disability policy and is renewable until

6    age seventy-five, if I'm disabled, I'm not

7    going to be working thirty hours a week.

8        Q.    Have you undertaken to read

9    through any of these policies to interpret

10   the language in them?

11       A.    I'm sorry?

12       Q.    Have you undertaken any

13   analysis of the language of these

14   policies?

15       A.    No.

16       Q.    Flip over to page three, if

17   you don't mind, under policy schedule.

18       A.    (Witness complies.)

19       Q.    Do you see there where it's

20   marked maximum benefit period?

21       Maximum benefit period,

22   (indicating)?

23       A.    Uh-huh (positive response).

Page 143

1      Q.    Do you see where it says to

2  the later of A, age sixty-five policy

3  anniversary, or B, twenty-four months

4  after disability payments begin?

5      A.    Okay.

6      Q.    Have I read that correctly?

7      A.    I'm sorry, what?

8      Q.    Have I read that correctly?

9  And just so we're clear, Exhibit 20

10  that you had in your file, and that you

11  produced to me, contains that same

12  language on page three of it under maximum

13  benefit period, correct, to the later of

14  age sixty-five policy anniversary or, B,

15  twenty-four months after disability

16  payments begin, right?

17      A.    Yes, I see that.

18      Q.    You don't deny that even if

19  you disagree with the maximum benefit

20  period under that policy, Unum advised you

21  of that provision in its policy as of its

22  letter of February 25, 2003, correct?

23      A.    On the rider form --

1    Q.    Go ahead and read to me what

2  you're looking at.

3    A.    6090, lifetime monthly

4  sickness benefit for total disability.

5    Q.    Keep reading.

6    A.    Maximum benefit period for

7  sickness before age sixty policy

8  anniversary lifetime.

9    Q.    Right.  It says under that,

10  and it's the same in Exhibit 20, lifetime

11  monthly sickness benefit for total

12  disability, maximum benefit period for

13  sickness before age sixty, correct?

14    A.    Uh-huh (positive response).

15    Q.    You were certainly beyond age

16  sixty in 2002, correct?

17    A.    (Witness nods head

18  affirmatively.)

19    Q.    Having turned sixty in 1998, I

20  believe, right?

21    A.    (Witness nods head

22  affirmatively.)

23    Q.    Do you contend that you were

1    entitled to some benefits under the

2    lifetime monthly sickness benefit

3    provision in 2002?

4         Let's look at it real quick.  And

5    I'm flipping in the copy that you gave me,

6    which is Exhibit 20.  It's actually got a

7    lifetime sickness benefit rider included

8    in there.

9         Let me have you look at Exhibit 20,

10   which was your copy that you brought with

11   you.  What you were reading to me from was

12   the lifetime monthly sickness benefit, and

13   what I'm showing you within the policy is

14   a lifetime sickness benefit rider.

15        And in Exhibit 11, I've actually

16   Bates labeled the page of that, and it's

17   going to be ULP0017, which is a lifetime

18   accident -- that's accident.  Let's go the

19   sickness.  Lifetime sickness benefit rider

20   is ULP0019, correct?

21        A.    Right.

22        Q.    And that's the benefit rider

23   for sickness, right?

1      And you don't deny that that was in

2    the copy of the policy that you produced

3    to me this morning, right?

4          That is in this (indicating)?

5          A.    Say that again.

6          Q.    That rider is in the copy that

7    you produced to me that we've now marked

8    as Exhibit 20, correct?

9          A.    Yes.

10          Q.    And it states under

11    termination at the bottom:  Coverage

12    terminates on the policy anniversary when

13    your age is sixty, correct?

14          A.    That's what it says.

15          Q.    Let's flip one more page --

16          A.    However, if you're totally

17    disabled as a result of sickness at that

18    time, the benefits provision of this rider

19    will apply beginning on the policy

20    anniversary when your age is sixty-five.

21          Q.    Right.  Were you totally

22    disabled as a result of sickness when you

23    turned sixty back in 1998?

1      A.    Well, it says that, but --

2  Okay.  All right.  I see what you're

3  saying.

4      Q.    You don't deny that you were

5  not disabled?

6      A.    So if you're two years older

7  than that, you're just out of luck; is

8  that right?

9      Q.    Well, sure.  I mean, a

10  contract has got to have provisions,

11  right.  There's got to be a cutoff date,

12  would you agree with that?

13      You don't contend that you're

14  entitled to any further benefits under

15  this lifetime sickness rider, do you,

16  based on what you just read?

17      A.    I'm sorry?

18      Q.    Based on what you just read,

19  you don't contend that you're entitled to

20  further benefits under this lifetime

21  sickness benefit rider, do you?

22      A.    Well --

23      Q.    And I'm not trying to trick

1  you, I'm trying to figure out the basis

2  for your claim.

3      A.     You know, if I had just been

4  glancing over this, I would not have

5  picked that up.  I would have just seen

6  lifetime sickness benefit rider.

7      Q.     Underneath that -- Right

8  underneath that in the topic it says:

9  Payable for sickness which begins before

10  the policy anniversary when your age is

11  sixty, that's right up at the top too,

12  right?

13      A.     Yeah.

14      Q.     Is that yes?

15      A.     That's a little unfair.

16      Q.     You think the wording is

17  unfair?

18      A.     That may be what Jim saw too.

19  Maybe he didn't read it all either.

20      Q.     Having read that now -- Let me

21  ask you this first.

22      Despite whether or not you disagree

23  about whether that policy, LAD169168,

1  which is marked as Exhibits 11 and 20 to

2  your deposition, whether or not you agree

3  that its maximum benefit period was to the

4  later of your reaching age sixty-five or

5  twenty-four months from the disability

6  date, you don't deny that Unum Life told

7  you that back in February of 2003, do you?

8          You don't deny they told you that

9  was their position back then, do you?

10         My question was whether or not you

11  disagree with their analysis of the

12  coverage available under Exhibit 11, you

13  don't deny that Unum told you back in

14  February of 2003 that the maximum benefit

15  period was the later of your reaching

16  sixty-five or twenty-four months after

17  disability began, do you?

18         A.    I don't deny they told me

19  that.

20         Q.    Do you contend that there's

21  some other provision -- Or let me ask you

22  this now that you've read the lifetime

23  sickness rider:  Do you contend that

1    there's some provision under the policy

2    referenced by Exhibit 11 under which

3    you're entitled to further benefits under

4    that policy?

5         Do you contend as you sit here today

6    that you're entitled to further benefits

7    under this policy marked Exhibit 11?

8         A.    I just said that the language

9    in it was a little misleading.

10        Q.    But you said you and Jim

11   didn't read that.

12        A.    If it had been specifically

13   pointed out to me that -- Where it says

14   lifetime sickness benefit rider, if it had

15   been pointed out and explained to me that

16   I had to get sick before age sixty or by

17   age sixty, I wouldn't have taken the

18   policy out.

19        Q.    You don't deny though that

20   that is what the policy says?

21        A.    That's what it says.  That's

22   just not what I understood it to say.

23        Q.    Let me ask you this:  Is this

1    your signature on the next page in Exhibit

2    11 which is ULP0020?

3            A.    Probably is.

4            Q.    Let me ask you this:  Do you

5    deny that you received twenty-four months

6    of benefits under that policy?

7            A.    Do I deny that I received it?

8            Q.    Yes, sir.

9            A.    No, I don't deny that I

10    received it.

11            Q.    Do you contend that you're

12    entitled to further benefits under that

13    policy?

14            A.    It would be a big help.

15            Q.    I understand that.  But do you

16    contend that you're entitled to further

17    benefits under the policy referenced by

18    Exhibit 11?

19            A.    Well, I think the way it's

20    written there, it's a very questionable

21    item.

22            Q.    Let's look at your copy, which

23    is Exhibit 20.  It says at least three

Page 152

1    different places that it's before age

2    sixty, right?  It says it on the fourth

3    page into Exhibit 20 that it's for

4    sickness before age sixty.

5         A.    Yeah.

6         Q.    And it says it at the top of

7    the lifetime sickness benefit rider right

8    underneath that heading, right, before age

9    sixty; and it says at the down at the

10   bottom of that same page under

11   termination, right?

12        A.    Why didn't the policy just

13   cancel at age sixty then?  Why did they

14   permit me to continue paying premiums on

15   it if I were not going to be covered after

16   age sixty?

17        Q.    You agree that the policy

18   still provided some coverage after age

19   sixty, don't you?

20        A.    Well, yes, it provided

21   twenty-four months.

22        Q.    Correct.  And it provided

23   coverage for some disabilities up to age

Page 153

1    sixty-five, correct?

2          A.    Right.

3          Q.    In fact, it provided coverage

4    for sickness up to age sixty-five,

5    correct?

6          A.    Right.

7          Q.    But only -- But for

8    twenty-four months?

9          A.    But up until age sixty it

10   provided lifetime coverage.

11         Q.    Correct.  So --

12         A.    If you were unfortunate like I

13   was to having to get sick at age

14   sixty-two, you only got twenty-four

15   months' coverage.

16         Q.    Well, you got sick at age

17   sixty-four, right, just months before you

18   turned sixty-five?

19         A.    Okay, sixty-four.

20         Q.    But you agree that the policy

21   provided coverage beyond just a lifetime

22   sickness benefit, correct?

23         A.    Yes.

1    Q.    And in fact, you received

2    twenty-four months' benefits under this

3    very policy.

4    A.    I received twenty-four months

5    benefit, yes.

6    Q.    So it had some benefit other

7    than just lifetime sickness, correct?

8    A.    Yes.

9    Q.    In Exhibit 14 --

10    A.    14?

11    Q.    14, yes, sir.

12    Second page, right here (indicating)

13    it says:  Upon receipt of your medical

14    records we will review them and determine

15    whether or not Dr. Baker meets the

16    criteria for the benefit for loss of use.

17    Should he meet this requirement, the

18    elimination period for this policy will be

19    waived and benefits will be payable from

20    his date of disability on December 19 of

21    2002.

22    Have I read that correctly?

23    A.    Yes.

1    months after disability payments commence,

2    provided you meet all of the provisions of

3    the policy.

4         Let's look at the policy, it's

5    Exhibit 12.  You don't deny that that

6    letter advises you that that policy

7    provides benefits?

8         A.    Which page?

9         Q.    Well, first of all, you don't

10   deny that this letter, Exhibit 14, advises

11   you that the policy provides a maximum

12   benefit to either you reaching age

13   sixty-five or for a maximum of twenty-four

14   months after your disability begins,

15   right?

16        A.    Okay.

17        Q.    You agree with that?

18        You agree that the letter advised

19   you of that?

20        A.    I'm sorry?

21        Q.    You agree that this letter

22   advised you of that, right?

23        A.    I've never read this letter.

Page 160

1    But I agree that that's what it is.

2            Q.    You don't deny that you

3    received twenty-four months of benefits

4    under Exhibit 12, do you, Dr. Baker?

5            A.    No.

6            Q.    Do you contend that you're

7    entitled to some further benefit under

8    Exhibit 12?

9            A.    Well, I'm a better dentist

10   than I am attorney.

11           Q.    But as you sit here today, do

12   you contend that there's some rider or

13   some provision under the policy referenced

14   by Exhibit 12 that entitles you to further

15   benefits under that policy, accepting the

16   fact you're not an attorney?

17           A.    I don't know if there's --

18   There's not a rider here.  I don't know

19   if --

20           Q.    And I'll give you the copy of

21   that same policy that's in the materials

22   you provided to me, and you can see if you

23   find one in there.  How about we do that?

Page 164

1    as the plaintiff in this lawsuit, you

2    don't see any provision in the policy that

3    I've marked as Exhibit 12 that you contend

4    would entitle you to further benefits

5    under that policy, do you, Doctor?

6         A.    Yeah.  Of course I haven't

7    read every word of it, but that's where

8    some of these things I have to depend on

9    this little red-headed woman right here

10   and her daddy to sort of guide me through

11   it.

12        Q.    Sure.

13        A.    I don't want anything I'm not

14   entitled to.

15        Q.    I understand that.

16        A.    I am not that kind of person.

17   But when you get to a point in life where

18   your income has stopped, then it's -- like

19   I said, it's a matter of

20   self-preservation, you're trying to

21   maintain some reasonable degree of living.

22   And, you know, it would be a big help to

23   me if there was some way that some of

1    these policies could give me more

2    benefits.  If there isn't, then my tough

3    luck.

4        Q.    And with regard

5    specifically -- We've already talked about

6    10 and 11.  But with regard specifically

7    to Exhibit 12, you don't see anything as

8    you look through there that you contend

9    entitles you to further benefits?

10       A.    No, I don't see anything.

11   Whether she or her dad sees anything here

12   or not, I don't know.

13       Q.    That's fair enough.

14       A.    It's like -- I'm a pretty good

15   dentist, but I'm not a very good attorney.

16       Q.    That's fair enough.

17       I'm going to ask you the same thing

18   with regard to the policy marked as

19   Exhibit 13.  Exhibit 13 is the overhead

20   expense policy, do you see that?

21       The maximum monthly overhead expense

22   benefit is a thousand dollars according to

23   page three of Exhibit 13, correct?

1    A.    (Witness nods head

2 affirmatively.)

3    Q.    And the maximum -- Did you

4 answer, I'm sorry?

5    A.    Yes.

6    Q.    And the maximum benefit period

7 under this policy is twenty-four months

8 according to page three, do you see that?

9    A.    (Witness nods head

10 affirmatively).

11    Q.    You don't deny that you've

12 been paid twenty-four months benefit under

13 this policy, do you, Dr. Baker?

14    A.    I still have overhead

15 expenses, they're just not in the office.

16    Q.    I understand that.  But you do

17 agree that that's what that said?

18    A.    Yes.

19    Q.    Do you contend that there's

20 some rider or provision in that policy

21 which has been marked as Exhibit 13 which

22 entitles you to further benefits?

23    A.    I will get with Beverly and

Page 167

1  have her get with Jim Large and see if

2  there are any riders anywhere.  My

3  situation, mental and physical conditions

4  have been such for the last two years, two

5  and a half years, till Beverly has had to

6  take care of everything.

7          Q.     Let me ask you this:  Are you

8  aware of whether any analysis has ever

9  been performed --

10         A.     I'm sorry?

11         Q.     Are you aware whether anyone

12 has undertaken an analysis of whether

13 you're entitled to any benefits under

14 these policies?

15         A.     No, I'm not aware.

16         Q.     You haven't done that?

17         A.     No.

18         Q.     Don't you think that that

19 would have been a good thing to do before

20 filing a complaint?

21         A.     Well, maybe so.  Well --

22         Q.     But as you sit here, you're

23 not aware of additional entitlement to

Page 168

1  benefits under the policy marked as

2  Exhibit 13, correct?

3        A.    Say that again.

4        Q.    As you sit here today, you're

5  not aware of any provision in the policy

6  marked Exhibit 13 that you contend

7  entitles you to further benefits; is that

8  fair?

9        A.    Yeah.

10       Q.    In count one of your complaint

11 you say that the defendant breached its

12 contracts with you.

13       Were you aware that you made that

14 allegation in your complaint?

15       A.    Is that in this one

16 (indicating)?

17       Q.    That's in this complaint right

18 here (indicating) that you signed.

19       A.    If I can read what you're

20 saying.

21       Q.    Sure, absolutely.

22       A.    I'm having more and more --

23       Q.    This is your complaint,

1   Exhibit 9, that you signed on the next to

2   the last page.

3       Count one, breach of contract.  And

4   it lists these four policies that we've

5   now marked as Exhibits 10, 11, 12, and 13.

6   and we've just gone through those four

7   policies.

8       Will you agree with me that we've

9   just gone through those four policies?

10      A.    Okay.

11      Q.    How did Unum Life breach any

12  one of those policies in your own words?

13      A.    I'm sorry, it's just going

14  away on me.

15      Q.    In your own words, how did

16  Unum Life, my client, breach any one of

17  those four policies?

18      A.    Well, I consulted with her

19  dad, and he felt that I might be due some

20  more benefits here.  And I sort of turned

21  it over to him at that point.

22      Q.    You can't tell me specifically

23  how there was any breach of contract?

1       A.      No, I can't.

2       Q.      You understand that you had to

3   meet the definition of disability in each

4   of the policies to get benefits, right?

5       A.      Yes.

6       Q.      And you understood that the

7   policies are contracts between the

8   insurance company and you, correct?

9       A.      Right.

10      Q.      And you understand that the

11  language of the contracts, including the

12  maximum benefit provision, govern the

13  obligations of the parties under the

14  contracts, right?

15      A.      Yes.

16      Q.      In addition to breach of

17  contract, you allege in your complaint

18  misrepresentation.  Count two,

19  misrepresentation and fraud, do you see

20  that?

21      A.      Uh-huh (positive response).

22      Q.      That's in Exhibit 9.

23      In paragraph twelve of your

1    A.    I'm sorry?

2    Q.    Is that what you're talking

3  about there in paragraph twelve of your

4  complaint, September 1, 200- --

5    A.    I remember Mr. Rogers talking

6  to me about this.  And I said, you know,

7  whatever I have available, just -- I'd

8  rather go ahead and have it in monthly

9  payments.

10    Q.    Rather than getting the lump

11  sum?

12    A.    Rather than the lump sum.

13    Q.    Do you contend there was

14  something bad about Unum Life offering you

15  a lump sum rather than paying it over

16  time?

17    A.    I just figured I'd spend it

18  faster.

19    Q.    Right.  But there was nothing

20  wrong with Unum Life offering that to you,

21  was there?

22    A.    I don't know why I chose to

23  just keep it coming in monthly -- in a

1    monthly payment, but at the time that just

2    seemed the thing to do.

3        Q.     But again, you're not saying

4    there was something evil or wrong with

5    Unum Life offering to give you advanced

6    payment, are you?

7        A.     No.   I didn't see anything

8    wrong with that.   I just --

9        Q.     From this paragraph thirteen

10    of your complaint, you go on to detail the

11    amounts that Unum Life was willing to pay

12    you in advance, right, in a lump sum

13    payment, right?

14        A.     I think it was sort of like a

15    guy who bailed out of a plane when it was

16    on fire, when he got back to headquarters

17    his general said why in the world did you

18    do that and were just ripping him up one

19    side and down the other.   He said, well,

20    at the time it just seemed the thing to

21    do.

22       That was Elmer Harris who was former

23    president of Alabama Power Company.

1    claim process.  All four policies should

2    be surrendered at the time as no further

3    benefits will be due as the final end date

4    will be met without recovery of his

5    condition.

6        So they're basically telling you in

7    advance that they don't think you're going

8    to recover from your condition, so they're

9    willing to go ahead and pay you in

10   advance; isn't that true?

11       A.    Yes.

12       Q.    Nothing wrong with that, is

13   there?

14       A.    Pardon?

15       Q.    There's nothing wrong with

16   that, is there?

17       A.    Not that I can see.

18       Q.    You certainly weren't damaged

19   by this offer of advanced payment, were

20   you?

21       A.    I'm sorry?

22       Q.    You certainty weren't damaged

23   by this offer of advanced payment?

1    A.    No.

2    Q.    In fact, you declined it,

3  didn't you?

4    A.    I don't remember why I chose

5  not to accept it at the time.

6    Yeah.  I think at the time we were

7  having some questions about this lifetime

8  sickness benefit order, and I guess in my

9  mind I felt like if I accepted that I was

10  closing the book on it.  And I -- Because

11  of that rider I was not quite willing to

12  close the book on it.

13    Q.    Right.  And in fact, you're

14  pointing out that Exhibit 18, the letter,

15  attaches a copy of a rider, and that's

16  referenced in the second paragraph of the

17  letter, isn't it?

18    It says, in response to Mrs. Baker's

19  inquiry concerning a lifetime sickness

20  benefit rider, we informed you that this

21  rider is no longer in effect and have

22  enclosed a sample copy for your client's

23  review.  Please note that this rider is

1    only payable for sickness which begins

2    before the policy anniversary when

3    Dr. Baker is age sixty.  Dr. Curtis Baker

4    was over age sixty at time of claim.

5          Have I read that correctly?

6          A.    Uh-huh (positive response).

7          Q.    Going to paragraph fourteen of

8    your complaint, it states that a telephone

9    conversation occurred on or around

10   December 7, 2004, between Plaintiff's

11   counsel and the Defendant corporation's

12   agent and/or fictitious party A's agent,

13   Sandy Giordano, during which conversation

14   Sandy Giordano explained that after

15   January 18, 2005, the Defendant

16   corporation would not be generating

17   payments to the plaintiff even though the

18   Defendant corporation admitted owing the

19   amount of twenty-eight thousand five

20   hundred in its letter of September 1, and

21   that the Plaintiff became aware of a fraud

22   worked upon him on or about December 7,

23   2004.

1          Do you know what that means, Doctor?

2          A.    I haven't read that before.

3          Q.    Is that a truthful paragraph?

4          A.    Well, I did not become aware

5     of a fraud, but then I'm not an attorney,

6     you know.  I just thought that we had room

7     for further discussions.

8          Q.    Well, let me ask you

9     specifically:  You don't think -- Number

10    one, you turned down the lump sum offer?

11         A.    I'm sorry.

12         Q.    Turned down the lump sum

13    offer?

14         A.    Yes, I did.

15         Q.    You elected to continue to

16    receive payments over time?

17         A.    Right.

18         Q.    You don't contend that they

19    should have paid you payments over time

20    and still been willing to give you the

21    lump sum, do you?

22         A.    No.

23         Q.    That wouldn't be fair, would

1    that I remember when he told me about this

2    twenty-eight thousand five hundred dollars

3    that I had the feeling that I was sort of

4    stopping relations with the company at

5    that point, and I chose not to do that.  I

6    wanted to continue the monthly -- I wanted

7    to keep the relationship going because I

8    think at the time I felt like I was due

9    more benefits than that.

10           Q.    And either way, it was an

11   election that you made, right?

12           You made the election, Unum Life

13   offered you two choices, they said you can

14   either get it in a lump sum or we'll keep

15   paying you over time, and you elected for

16   them to keep paying you over time, right?

17           A.    Yeah.

18           Q.    You don't contend that there

19   was some misrepresentation associated with

20   that, do you?

21           A.    No.  I think it was more of a

22   situation where -- that I was just not

23   comfortable with and I didn't totally

1    Q.    And they continued to pay you

2  benefits over time after September 1,

3  2004, right?

4    A.    Yeah.

5    Q.    How much were you paid in

6  benefits after September 1, 2004, do you

7  know?

8    A.    I don't have any idea.

9    Q.    You don't deny that -- You've

10  already told me that you don't deny

11  receiving twenty-four months benefits

12  under all four policies; is that right?

13    A.    As far as I know, that's

14  right.

15                    (Whereupon, Exhibit No.

16                    19 was marked for

17                    identification.)

18    Q.    Look at Exhibit 19 if you

19  will, please, sir.

20    A.    (Witness complies.)

21    Q.    That's a copy of a letter of

22  February 25, 2005, from Unum Life to your

23  attorney advising, essentially, that you'd

1    policies, are you aware of any basis for

2    that statement that they changed one or

3    more of the plaintiff's lifetime rider

4    policies?

5        A.    Well, that's -- I don't know

6    what he saw in there to make the

7    statement.

8        Q.    You haven't seen any evidence

9    that Unum Life changed some lifetime

10   rider?

11       A.    Well, no.  But I haven't

12   studied it like he has either.

13       Q.    All right.

14       You certainly can't show me a

15   document that represents a policy at one

16   point and then some later version of it

17   that's got some change in it, can you?

18   You don't have anything like that, do you?

19       A.    Not that I know of.

20       But, Beverly has taken care of all

21   of this, and Jim Large and Joel.

22       Q.    With regard to your claim that

23   my client made some false representation,

1    representative said one thing and the

2    policy said something else.

3        Q.    The representative being Jim

4    Large?

5        A.    I think it was Jim.  I

6    remember sometime along there he

7    introduced me to another insurance agent

8    or two, and it may have been that other

9    insurance agent that did this.

10       Q.    But this would have been --

11       A.    I just -- Jim handled mostly

12   my life insurance.

13       Q.    But, again, as you already

14   said, this would have been at a point in

15   time when these policies were taken out,

16   right?

17       A.    I'm sorry, say it again.

18       Q.    This alleged misrepresentation

19   would have been at or around the time that

20   these policies were taken out, correct?

21       A.    Yes.

22       Q.    So that would have been back

23   in '66, '92, or 1976, right?

Page 195

1    A.    Yeah.  Somewhere along there.

2    Q.    You're not contending that

3 there's been any misrepresentation since

4 1976, 1992, or 1966, are you?

5    A.    Well, I was carrying on an

6 extremely busy dental practice, and I

7 usually accepted the representative's word

8 for what was in the policy.

9    I didn't get these policies down and

10 study every word in there.  So -- I

11 haven't had any reason to look at it word

12 for word until now.

13    Q.    Okay.  Do you -- You've told

14 me that the representations, to the extent

15 they were misrepresentations, were made

16 back when these policies were taken out,

17 correct?

18    A.    Possibly, yes.

19    Q.    Are you aware of any others?

20    A.    You know, I hate to point my

21 finger at anybody and say you

22 misrepresented something, you know.

23    Q.    But that's what you need to do

1    to maintain a lawsuit against someone.  So

2    what I'm here today to find out is the

3    specifics of your claim.

4          A.    Okay.

5          Q.    If I can't get the specifics

6    of your claim here, I'm wasting both of

7    our time.

8          A.    I think that's what happened.

9          Q.    You think that Jim Large made

10   a misrepresentation to you back when you

11   purchased these policies?

12         A.    I'm not sure that it was Jim

13   or this other guy, and I don't know who

14   the other guy was.  But I don't think that

15   Jim would have done it intentionally.  I

16   think it would have just been a mistake,

17   we're all, as humans, subject to making

18   sometimes.

19         Q.    Okay.  The alleged

20   misrepresentations you contend were made

21   back when these four policies were

22   purchased, right?

23         A.    Yes.

Page 197

1       Q.     And that would have been in

2    1966, 1976, and 1992, correct?

3       A.     Yeah.

4       Q.     You don't contend that there

5    have been misrepresentations since then,

6    do you?

7       A.     No, not since then.

8       Q.     I want to know what

9    specifically you contend was

10   misrepresented to you back in 1966, 1976,

11   or 1992?

12      A.     Well, it was my understanding

13   that these benefits were lifetime benefits

14   if I became totally disabled and unable to

15   practice dentistry.

16      Q.     You said it was your

17   understanding.  Who specifically told you

18   that?

19      A.     It was either Jim or the guy

20   he introduced to me some time ago, and I

21   don't know who that was.

22      Q.     How long has it been since

23   you've spoken to that other guy?

Page 198

1    A.    I'm sorry?

2    Q.    How long has it been since
3  you've spoken to that other guy?

4    A.    Since I took the insurance
5  out.

6    Q.    Back in either 1966 or --

7    A.    No.  That -- There was a lady
8  insurance representative who sold me then,
9  she's been dead several years.  The other
10 guy, maybe the one in '76, and maybe even
11 in '92.  I don't remember.

12    But I don't think that Jim was
13 personally handling disability insurance,
14 he was just -- I think that it's my
15 understanding he just helped me get some
16 disability insurance.  But I don't
17 remember who it was with.

18    Q.    But it's been at least since
19 1992 that you talked to this other person,
20 right?

21    A.    I'm sorry?

22    Q.    It's been at least since 1992
23 that you talked to this other person?

Page 199

1    A.    Yeah.  It's been at least that

2    long.

3    Q.    What specifically did either

4    Jim or this other person say to you that

5    you contend was a misrepresentation?

6    A.    They probably said okay,

7    because I said I wanted insurance that

8    will cover me if I am disabled and unable

9    to practice dentistry.  And I want this

10   for lifetime if I'm disabled for lifetime.

11   He said okay.

12   Q.    Which of the two said okay?

13   A.    That was about the extent of

14   it.  He was writing down, and I assume

15   that he was writing all of this down, and

16   I assume that that was what I was getting.

17   But that obviously must be something else.

18   Q.    Any other statements that you

19   contend were misstatements or

20   misrepresentations made to you by any

21   agent of my client -- agent or

22   representative of my client?

23   A.    Things that happened thirty

Page 201

1    that?

2           A.     No.  Or I do not remember it

3    if they did.

4           Q.     But it's certainly in the

5    policies?

6           A.     Yeah.  I just -- But I don't

7    think they -- I don't think that they

8    explained that to me.

9           Q.     It's possible that they did,

10   but you don't remember it, isn't it,

11   Doctor?

12          A.     That's possible, yes.

13          Q.     And it's certainly stated in

14   the policy itself, isn't it?

15          A.     I'm sorry?

16          Q.     The particulars are certainly

17   stated in the policy themselves, correct?

18          A.     Right.

19          Q.     And you've admitted that you

20   received the policies, correct?

21          A.     (Witness nods head

22   affirmatively.)

23          Q.     Any other claims?

1    Q.    That's the best you recall?

2    A.    That's the best I recall.

3    Q.    Have we now covered all

4 alleged misrepresentations?  Have we now

5 covered all of the statements you claim

6 are misrepresentations by my client or any

7 agent or representative of my client?

8    A.    Well, that's the main thing.

9 You know, I don't know -- Mr. Rogers, I

10 think, had some questions about some other

11 things, but I can't speak for him.  I

12 don't know what he had in mind.

13    Q.    You don't contend that any

14 other false statements were made to you,

15 do you?

16    A.    No.  I don't think so, not to

17 me personally.

18    Q.    You don't contend that either

19 Jim Large or this other person intended

20 not to follow-through with their

21 representation to you, do you?

22    Strike that.

23    You don't contend that Jim Large or

1    this other person intended not to provide

2    you the coverage that you wanted, do you?

3         A.    No.

4         Q.    You don't contend that this

5    Jim Large or this other fellow intended to

6    deceive you at the time they made these

7    statements?

8         A.    No.  I think -- If it were an

9    error, I really feel it was just a human

10   error; I don't think it was an

11   intentional.  I've known Jim Large for so

12   many years, I trust him with my life.

13        Q.    And you don't think this other

14   person intended to mislead you or deceive

15   you, do you?

16        A.    No.

17        I think if there were a deception

18   there it was just -- again, I feel like it

19   was a human error.

20        Q.    And, again, you've already

21   told me that that person, whether it was

22   Jim Large or this other fellow, could

23   possibly have further explained to you

1  those riders, correct, and you just don't

2  remember; is that correct?

3       A.    Yeah.

4       Q.    You don't have any evidence

5  that Unum Life or any other insurer or any

6  of their representatives at the time this

7  alleged representation was made intended

8  not to pay a legitimate claim for benefits

9  that you might file in the future, do you?

10      A.    No.   Not to my knowledge.

11      Q.    And you don't have any

12  evidence that Unum Life intended to

13  deceive you at the time that alleged

14  representation was made?

15      A.    No.

16      Q.    And I know all this sounds a

17  little repetitive, but bear with me one

18  more question.

19      You don't have any evidence that any

20  defendant intended, when this alleged

21  representation was made, not to pay you

22  benefits if you met the policy definitions

23  of disability, do you?